## UNITED STATES DISTRICT COURT FOR
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| BOYD GAMING CORPORATION, BRIAD RESTAURANT GROUP, L.L.C., CREATIVE HAIRDRESSERS, INC., MGM RESORTS INTERNATIONAL, RATNER COMPANIES, L.C., SEMINOLE HARD ROCK ENTERTAINMENT, INC., SEMINOLE TRIBE OF FLORIDA, AND TGI FRIDAY'S INC.,<br><br>Plaintiffs,<br><br>v.<br><br>VISA INC., VISA U.S.A INC., VISA INTERNATIONAL SERVICE ASSOCIATION, MASTERCARD INCORPORATED, AND MASTERCARD INTERNATIONAL INCORPORATED,<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT and<br>DEMAND FOR JURY TRIAL** |

Plaintiffs Boyd Gaming Corporation, Briad Restaurant Group, L.L.C., Creative Hairdressers, Inc., MGM Resorts International, Ratner Companies, L.C., Seminole Hard Rock Entertainment, Inc., Seminole Tribe of Florida, and TGI Friday's Inc. ("Plaintiffs") sue Defendants Visa, Inc., Visa International Service Association, MasterCard Incorporated, and MasterCard International Incorporated, and allege as follows:

### INTRODUCTION

1.      Plaintiffs operate retail outlets that accept Visa and MasterCard Credit Cards, Signature Debit Cards, and PIN-Debit Cards as forms of payment. Plaintiffs challenge Defendants' collusive and anticompetitive practices pursuant to Sections 1 and 2 of the Sherman Act.  The contracts, combinations, conspiracies, and understandings entered into by the

Defendants have harmed competition and imposed upon Plaintiffs supracompetitive, exorbitant, and collectively-fixed prices in the Relevant Markets defined herein.

2.     Visa and MasterCard, the two preeminent global payment card networks, have each entered into per se unlawful horizontal combinations and conspiracies with their respective affiliate banks to fix the price of fees paid to the banks by Plaintiffs and other merchants and to prevent competition for payment card network services. Each combination has as its members the overwhelming majority of banks or financial institutions that issues credit and debit cards in the United States. The vast majority of the banks and financial institutions that are members of Visa are also members of MasterCard (collectively, the "Card Associations"), and issue both Visa-branded and MasterCard-branded credit and debit cards. These issuing banks are independently owned and managed banks and financial institutions that compete to issue credit and debit cards to consumers. However, through their membership in and agreement to abide by the rules of the Card Associations, each issuing bank has agreed not to compete for merchant acceptance of the credit and debit cards that it issues.

3.     There are two main categories of payment cards: credit (including charge) cards and debit cards. Credit cards are payment cards that allow consumers to make purchases on credit. Charge cards are similar to credit cards but require that the full balance be paid upon receipt of the billing statement.  Debit cards are linked to a consumer's demand deposit account ("DDA") and immediately withdraw money from a DDA or are prepaid.

4.     Banks earn income on credit (and charge) cards through fees and charges to the cardholder, including interest on the account balance, and from the fees and penalties that come with late payment on card balances.  Banks earn income on debit cards through the opportunity to use the funds a consumer maintains in his or her account and on various fees associated with

those accounts.  Banks also earn income on credit and debit cards through the interchange fees paid by merchants.  Interchange fees are imposed on merchants by the Card Associations for the privilege of accepting the issuing bank's card from a consumer as a means of payment, and are collected from the merchant and paid to the issuer of the card, to the merchant's bank, and to the Card Associations.  The profitability to these entities of credit and debit cards directly increases with the size and frequency of transactions in which the cards are used.  Credit and debit cards are among the most profitable portions of the issuing banks' businesses, generating significant revenue through high interest rates, fees, and other ancillary products.

5.      Banks issuing credit and debit cards, including issuing banks that are members of the Card Associations, compete with one another to issue cards to consumers (sometimes referred to hereafter as "cardholders") who use those cards to purchase goods and services from merchants.  Issuing banks that are members of Visa and MasterCard compete with each other in the issuance of credit and debit cards to consumers.  For example, issuing banks offer cards with various combinations of interest rates, annual fees, cash back rewards, points, and other features to compete for cardholders and to induce cardholders to use their cards.

6.      The Card Associations have adopted nearly identical rules, which are agreed to by their member banks and imposed on merchants that accept cards issued by those banks.  These rules ("Competitive Restraints") eliminate competition among their member issuing banks for merchant acceptance of credit cards and debit cards. As a consequence of having as members nearly all card issuers in the United States, and as a consequence of those card issuers having agreed to rules that preclude them from independently competing for merchant acceptance, the Card Associations and their members have obtained and maintained market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards in

the United States. The exercise of this market power has led merchants to pay excessive interchange fees and network fees, injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare. Excessive interchange and network fees also lead to lower merchant acceptance of credit and debit cards.  The competitive harm caused by the excessive interchange and network fees has not been offset by benefits received by cardholders.  Indeed, in May 2013, Visa CEO Charles W. Scharf admitted that Visa's rules "stood in the way of [banks] working together to do something positive for the merchant." Both Visa's and MasterCard's rules equally bar issuing banks from doing "something positive" for cardholders, who would have benefitted from banks competing for their business by differentiating their offerings, including by offering discounts and other benefits at the point of sale, through direct deals with merchants.  In this manner, the Card Associations have unlawfully restrained and continue to unlawfully restrain competition in these markets.

7.    The principal rules that constitute the Competitive Restraints are the setting of "default" interchange fees, the Honor All Cards Rules, the All Outlets Rules, the No Discount Rules, the Anti-Discrimination Rules, and the No Surcharge Rules.  In addition, the Competitive Restraints include rules through which Visa and MasterCard have suppressed competition for the provision of network services, such as their No Competing Marks Rules and Visa's No Bypass Rules.  These rules, regulations, and practices, individually and in combination, preclude merchants from gaining the benefits of competition as to the terms, including a fee (if any), for the acceptance of cards of particular issuing banks and preclude card issuers from competing for merchant acceptance of their cards.  As a consequence, the setting of "default" interchange fees effectively fixes the price of acceptance at a supra-competitive level.   Plaintiffs have paid and continue to pay significantly higher costs to accept Visa-branded and MasterCard-branded credit

and debit cards than it would if the banks issuing such cards competed for merchant acceptance, injuring both Plaintiffs and consumers (including cardholders) through higher costs and decreased consumer welfare.

8.     The Competitive Restraints have had at least the following adverse effects on competition: (1) increasing or maintaining prices, including interchange rates and network fee rates, at levels that are higher than they would have been in a competitive market; (2) raising or maintaining barriers to the entry or expansion of new or existing market participants; (3) excluding competition for merchants' transaction volume among payment card networks and among issuers within a given payment card network; and (4) reducing output and decreasing quality in the relevant market as whole, including as a result of reduced consumer choice.

9.     Because of their participation in the Competitive Restraints through their membership in the Card Associations, issuing banks do not compete for transaction volume by independently competing for merchant acceptance.  The Competitive Restraints have ensured that issuing banks have not competed on the basis of differentiating their offerings to cardholders through direct deals with merchants that would have enabled such differentiation at the point of sale.  Competition also would have enabled issuing banks to differentiate their products from competing issuing banks' products.  Cardholders (and other consumers) have paid higher prices and received less choice and innovation as a result.

10.    The Card Associations, on behalf of their member issuing banks, have exploited their market power in the market for merchant acceptance of credit cards and the market for merchant acceptance of debit cards by creating interchange fee schedules designed to increase the amount of interchange fees issuing banks are able to obtain from merchants.  While the Card Associations nominally refer to these schedules as "default" interchange fee schedules,

suggesting it is possible for issuing banks and merchants to gain different interchange rates by entering acceptance agreements between themselves, the Competitive Restraints prevent such agreements. The Competitive Restraints also eliminate competition by removing the ability of issuing banks to compete for merchant acceptance through setting low "default" interchange fees. By setting and enforcing supra-competitive interchange fees applicable to all merchants that accept cards issued by their members, the Card Associations act as agents of their members for the purposes of exercising the market power gained by their combinations. Further, Visa, MasterCard, and their members exploited their market power to set the default interchange fees.

11. Over the past decade, judicial efforts to curb the exercise of market power by the Card Associations combinations have been ineffective. In 2003, the exclusivity rules of both combinations, which prohibited member banks from issuing cards competing on American Express or Discover networks, were declared unlawful. In that same year, in a class action settlement, the Card Associations agreed to cease using the Honor All Cards Rules to tie credit card acceptance and debit card acceptance. Those actions did not diminish the Card Associations' power to dictate price and prevent competition. Instead, both combinations increased the credit card interchange fees extracted from merchants and used their market power to force merchants to accept rewards and commercial cards in order to accept basic credit card services. The debit card interchange fees they were imposing after these judicial actions were subsequently found by the Federal Reserve Board to be significantly above cost.

12. On May 22, 2006 and March 19, 2008, MasterCard and Visa, respectively, commenced initial public offerings (IPOs) for the primary purpose of dispelling the appearance that they maintained an ongoing conspiracy with the member banks that previously owned the networks. But even after those IPOs, neither MasterCard and its co-conspirators nor Visa and its

co-conspirators ceased the conduct which, separate and apart from the setting of interchange rates, caused MasterCard and Visa interchange rates to be supracompetitive, namely, the continued maintenance and enforcement of their respective Competitive Restraints. Subsequent to May 22, 2006, each MasterCard member bank continued to agree with MasterCard and with each other, and subsequent to March 19, 2008, each Visa member bank continued to agree with Visa and with each other, to perpetuate, maintain and enforce (1) the MasterCard Competitive Restraints or (2) the Visa Competitive Restraints.

13.   Visa and MasterCard may have ended their financial institution members' direct participation in the setting of interchange rates at some time after January 1, 2004, and before their respective IPOs, and Visa and MasterCard may have removed their financial institution members from the Visa and MasterCard boardrooms with their IPOs, but those actions did not end Visa's and MasterCard's monopoly power, or each network's maintenance or enhancement of its monopoly power. That is because the Visa and MasterCard Competitive Restraints remained agreed to by and among the respective member banks and Visa, and the respective member banks and MasterCard, and those Competitive Restraints continued materially undisturbed and enforced by Visa and MasterCard and their respective co- conspirators throughout the relevant time period.

14.   In 2008, in response to a U.S. Department of Justice investigation, Visa withdrew its rule limiting merchants' ability to accept PIN debit cards.  Two years later, in a settlement with the Department of Justice, the Card Associations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed.  These changes did not diminish the Card Associations' market power or lead to a reduction in interchange fees paid by Plaintiffs; instead the interchange fees continued to increase.

15.   In 2011, as mandated by the Durbin Amendment to the Dodd-Frank Wall Street Forum and Consumer Protection Act, , 15 U.S.C. 1693o–2, the Federal Reserve Board set a maximum level of interchange fees that large banks could levy on debit card transactions and eliminated any distinction between signature debit (which carried interchange rates often comparable to credit interchange rates) and PIN debit interchange.  This maximum fee was set significantly below the then-existing interchange fee levels set by the Card Associations for debit card transactions.  The Federal Reserve Board action did not apply to the approximately one-third of debit cards issued by smaller banks, nor did it apply to credit cards.  The Federal Reserve Board did not prohibit debit or credit interchange fees from being set below this maximum level.

16.   If freed of the imposition of "default" interchange fees and the Competitive Restraints, issuing banks and merchants would operate in competitive markets for merchant acceptance of credit cards and debit cards and benefit from competition among issuing banks as to interchange fees.  Collectively set interchange fees do not protect merchants such as Plaintiffs, but rather, upon information and belief, allow issuing banks to charge interchange fees far in excess of the issuing banks' costs.  In competitive markets, interchange fees would move to competitive levels, and the interchange fees paid by Plaintiffs would be substantially below the amounts it has paid since January 1, 2004.  If merchants had the ability to use competitive strategies with respect to their acceptance of the cards of individual issuers, they would induce competition among issuing banks that would lead to lower interchange fees.  Further, in the absence of "default" interchange fees and the Competitive Restraints, incentives for issuing banks to compete vigorously for cardholders would increase, and cardholders would continue to receive rewards or comparable benefits from issuing banks, who would seek to ensure that they continue to benefit from the profitability of their card businesses.

17.   Elimination of the Competitive Restraints and restoration of competitive markets for merchant acceptance would substantially reduce interchange fees, allowing Plaintiffs to operate more efficiently and at lower costs, to the benefit of consumers.  Plaintiffs operate in competitive markets and would use the savings from a reduction in their interchange costs to increase its competitiveness by enhancing the value their customers receive.  In a market in which the structure and funding of incentives were not determined by agreement among the members of Visa and MasterCard, rewards would continue to be offered, given the profitability of cardholder issuances and usage to issuing banks. Individual issuing banks nevertheless would have incentives to differentiate their products and fund rewards or other features of equal or greater benefit to cardholders, given the significant revenue issuing banks earn from card issuances and the loans generated by those cards.

## JURISDICTION AND VENUE

18.   This action arises under section 1 of the Sherman Act, 15 U.S.C. § 1, and section 4 of the Clayton Act, 15 U.S.C. § 15(a). Plaintiffs seek to recover treble damages, costs of suit, injunctive relief, and reasonable attorneys' fees for the injuries sustained by Plaintiffs resulting from Defendants' successful efforts to restrain trade in the United States.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1407, and 15 U.S.C. § 15.

19.   Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. §§ 1391(b), (c), and (d) because, during the relevant period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of their activity that affected the interstate trade and commerce discussed below has been carried out in this District.

20.   During the relevant period, Defendants sold network services in a continuous and uninterrupted flow of interstate commerce, including in this District.  Defendants' conduct had

direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this District.

21.   This Court has *in personam* jurisdiction over Defendants because they, either directly or through the ownership and/or control of their subsidiaries, *inter alia*: (a) transacted business throughout the United States, including in this District; (b) participated in selling network services throughout the United States, including in this District; (c) had and maintained substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an anti-competitive and otherwise illegal conduct that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District.  Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

22.   By reason of the unlawful conduct alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for network services, which unreasonably restrained trade and adversely affected the market for network services.

23.   Defendants' unlawful conduct described herein adversely affected persons and entities in the United States who purchased network services, including Plaintiffs.

## **DEFINITIONS**

24.   For purposes of this Complaint, the following definitions apply.

25.   "Credit cards" are payment cards enabling the cardholder to purchase goods or services from any merchant that has an agreement to accept such cards.  The credit cards at issue here are general purpose payment cards, as distinguished from private label cards, which can only be used at a single merchant.  (While commonly referred to as "payment cards," from an issuing bank's perspective, credit cards are simply a vehicle for granting consumers access to unsecured lines of credit.  For issuing banks, credit cards are means that banks provide for their account customers to access their lines of credit.  Widespread merchant acceptance of those cards is crucial to the value of the credit account for both the cardholder and the issuing bank.).  Payment to a merchant for the goods or services purchased using a credit card is made by the issuing bank of the card on behalf of the cardholder, with repayment by the cardholder subject to an agreement between the issuing bank and the cardholder.  Credit cards enable a cardholder to obtain goods or services from a merchant on credit provided by the card issuer. Credit card issuers compete for consumers by offering a variety of terms and types of cards, which, in many cases, vary by level of rewards that are intended to induce consumers to use their cards.  Cards with a higher level of rewards are often referred to as "premium" cards and carry higher interchange fees, though they afford no additional benefits to merchants.  All credit cards, as the term is used in this Complaint, including charge cards, allow the cardholder to obtain goods or services with a grace period before the cardholder is required to pay his or her full balance.  Unlike charge cards, such as those issued by American Express, that generate revenue for the vertically integrated issuer primarily from fees charged to merchants, credit cards generate revenue primarily from a variety of fees and interest charged to cardholders by issuing banks.

26.   "Debit cards" are payment cards that allow holders of a DDA at a bank to pay for goods or services or to obtain cash by directly accessing their DDA.  They also include pre-paid

cards, which require a consumer to pay money which is loaded onto a card that will be drawn

down by the user of the card when it makes a purchase with the card.  (While commonly referred

to as "payment cards," from an issuing bank's perspective, debit cards are simply a vehicle for

granting consumers access to funds in their demand deposit account.  For issuing banks, debit

cards are means that banks provide for their account customers to access their checking account.

Widespread merchant acceptance of those cards is crucial to the value of the demand deposit

account for both the cardholder and the issuing bank.) There are two methods of authenticating

debit cards.  PIN debit cards require the cardholder to enter a four-digit personal identification

number (PIN) to authenticate the cardholder. Signature debit cards usually require the

cardholder's signature at the time of the transaction.  In the past, some PIN debit cards did not

carry interchange fees or were subject to reverse interchange – where the merchant received a fee

for card acceptance.  Signature debit cards generally carried higher interchange fees, some of

which equaled the interchange fees charged for credit card transactions.  In 2011, pursuant to the

Durbin Amendment, Federal Reserve Board regulations set the maximum interchange fee for

regulated issuers at \$.21 plus 0.05% (plus an additional \$.01 for fraud prevention for eligible v

issuers), or an average of \$.23-.24 per debit transaction.  In contrast, the signature debit

interchange fees previously set by Visa and MasterCard average \$.58 and \$.59, respectively, for

the same issuers.

27.   Charge cards, while they include a grace period, require a cardholder to pay the

balance in full upon a due date set forth in the cardholder statement sent to a cardholder each

month, since typically no credit is extended to pay off a balance over time.

28.   An "issuing bank" is a member of Visa or MasterCard that issues credit or debit

cards to cardholders.  The majority of issuing banks are members of both Visa and MasterCard

and compete with one another to issue cards to potential cardholders and to encourage the use of their cards by cardholders.  However, such competition is limited by the issuing banks' membership in Visa and MasterCard.

29.   A "processor" is an entity that a merchant contracts with to handle credit and debit card transactions on behalf of an acquiring bank, including both front-end and back- end processing functions.  Front-end processing functions are the functions that connect card networks, and supply authorization, clearance, and settlement services, to merchants.  Back-end processing functions are the functions that reconcile transactions from merchants' front-end processors and that allow for the movement of funds from the issuing bank to the merchant's bank.

30.   An "acquiring bank" is a member of the Card Associations that acquires purchase transactions from merchants.  All acquiring banks are members of Visa and MasterCard.  As member banks, acquiring banks act as gatekeepers, ensuring that card transactions are routed over the Visa or MasterCard networks, that interchange fees set by Visa and MasterCard are paid on all transactions, and that merchants abide by the rules imposed by Visa and MasterCard.  Acquiring banks compete with one another for the acquisition business of merchants.

31.   "Network services" include, among other things, the services of authorization, clearance, and settlement of payment card transactions that the members of Visa and MasterCard have delegated to the networks to provide on the members' behalf. Authorization, clearance, and settlement refer to the process by which payment card transactions are completed.

32.   "Network fees" are fees assessed by Defendants on merchants as a condition of their acceptance of Defendants' branded cards and include, but are not limited to, assessment fees, acquirer processing fees, the Transaction Integrity Fee, and other network access fees.

13

33.   "Interchange fee" is the fee that issuing banks receive and merchants pay when they accept a credit card or debit card issued by a member of the Card Associations. Under the agreements by and among Visa and its member banks and MasterCard and its member banks, the so-called "default" interchange fees are set by Visa and MasterCard, respectively, and  the payment on interchange and other rules are enforced through the acquiring banks.

34.   "Merchant discount" is the term used to describe the total amount of fees and other costs deducted from the original transaction amount, reflecting a merchant's incremental cost of acceptance.  The merchant discount includes the interchange fee.

## THE PARTIES

## PLAINTIFFS

35.   Boyd Gaming Corporation ("Boyd") is a Nevada corporation with its principal place of business  in Las Vegas, Nevada.  Boyd accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, Boyd has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  Boyd, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.  On July 19, 2019, Boyd timely opted out of the Rule 23(b)(3) settlement class in the case captioned: *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

36.   Briad Restaurant Group, L.L.C. ("Briad") is a  New Jersey limited liability company with its principal place of business  in Livingston, New Jersey.  Briad accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, Briad has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  Briad, therefore, has been injured in its business or property as a result

of the unlawful conduct alleged herein.  On July 22, 2019, Briad timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

37.    Creative Hairdressers, Inc. ("CHI") is a Virginia corporation with its principal place of business in Vienna, Virginia.  CHI accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, CHI has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  CHI, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.  On July 16, 2019, CHI timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

38.    MGM Resorts International ("MGM") is a Delaware corporation with its principal place of business  in Las Vegas, Nevada.  MGM, through its subsidiaries, accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, MGM has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  MGM, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.  On July 18, 2019, MGM timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

39.    Ratner Companies, L.C. ("Ratner") is a Virginia limited liability company with its principal place of business

in Vienna, Virginia.  Ratner accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, Ratner has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  Ratner, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.  On July 16, 2019, Ratner timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

40.     Seminole Hard Rock Entertainment, Inc. ("Hard Rock") is a Florida corporation with its principal place of business in Hollywood, Florida.  Hard Rock accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, Hard Rock has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  Hard Rock, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.   On July 17, 2019, Hard Rock timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

41.     Seminole Tribe of Florida d/b/a Seminole Gaming ("Seminole Gaming") is a federally recognized indian tribe with its principal place of business in Hollywood, Florida.  Seminole Gaming accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, Seminole Gaming has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  Seminole Gaming, therefore, has been injured in its business or property as a result of the unlawful conduct

alleged herein.   On July 17, 2019, Seminole Gaming timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

42.   TGI Friday's Inc. ("TGIF") is a New York corporation with its principal place of business in Dallas, Texas.  TGIF accepts both Visa and MasterCard debit and credit cards for payment in its retail outlets.  Accordingly, TGIF has been forced to pay Defendants' supra-competitive interchange fees and to abide by Defendants' Competitive Restraints.  TGIF, therefore, has been injured in its business or property as a result of the unlawful conduct alleged herein.   On July 18, 2019, TGIF timely opted out of the Rule 23(b)(3) settlement class in the case captioned:  *In re Payment Card  Interchange Fee and Merchant Discount Antitrust Litigation*, Case No. 1:05-md-01720,  United States District Court for the Eastern District of New York.

43.   When a customer presents a card to make a payment, there is an authorization process with the card issuer to determine if the card is open to buy and the transaction is authorized.  Plaintiffs route the amount of the purchase through their processing system to the Acquiring Bank.  The Acquiring Bank presents the transactions for settlement at the end of each day and the Card Associations or other network card association allocates the transaction to the correct customer's card account with the issuing bank.  The issuing bank settles with the Acquiring Bank each night and provides the funds necessary to fund the amount of the purchase on the card.

44.   Plaintiffs pay interchange fees directly by paying the issuing bank's fee and the Acquiring Bank's discount fee for processing the transaction through a deduction from the net

amount deposited to Plaintiff's bank account at the Acquiring Bank.  Various adjustments will be made including chargebacks, for fraudulent transactions or when there are complaints of errors by customers.

## DEFENDANTS

45.    Until the corporate restructuring and initial public offering described below, Defendant Visa International Service Association was a non-stock Delaware corporation with its principal place of business in Foster City, California.  Defendant Visa U.S.A., Inc. was a group member of Visa International Service Association and was also a non-stock Delaware corporation.  Visa U.S.A., Inc. had its principal place of business in San Francisco, California.  Visa U.S.A., Inc.'s members were the financial institutions acting as issuing banks and acquiring banks in the Visa system.

46.    Defendant Visa Inc. is a Delaware corporation with its principal place of business in San Francisco, California.  Defendant Visa Inc. was created through a corporate reorganization in or around October 2007.  Visa U.S.A., Inc.'s member banks were the initial shareholders of Visa, Inc.

47.    Defendants Visa Inc., Visa USA, Inc., and Visa International Service Association are referred to collectively as "Visa" in this Complaint.

48.    Defendant MasterCard Incorporated was incorporated as a Delaware stock corporation in May 2001.  Its principal place of business is in Purchase, New York.

49.    Defendant MasterCard International Incorporated was formed in November 1966 as a Delaware membership corporation whose principal or affiliate members were its financial institution issuing banks and acquiring banks.  Prior to the initial public offering described

below, MasterCard International Incorporated was the principal operating subsidiary of

MasterCard Incorporated.

50.   Defendants MasterCard International Incorporated and MasterCard Incorporated are

referred to collectively as "MasterCard" in this Complaint.

## FACTUAL ALLEGATIONS

## THE PAYMENT CARD INDUSTRY

51.   The payment card industry involves two categories of general-purpose payment

cards: (1) credit (including charge) cards and (2) debit (including prepaid) cards.  As explained

more fully below, credit cards constitute a separate product market from debit cards.

52.   Card issuers earn income when card users select and use their cards and when

merchants accept their cards.  Issuing banks compete to have cardholders carry and use payment

cards that they issue.  By agreeing to the Competitive Restraints, issuing banks have agreed not

to compete among themselves for merchant acceptance of payment cards.  Issuing banks are paid

interchange fees by merchants at the time a transaction is settled.  Interchange is only one source

of revenue for issuing banks, however.  The largest source of revenue for card issuers is interest

on card balances maintained by cardholders.  Interest rates on unpaid credit card balances are

among the highest interest rates charged for consumer lending transactions, even for extremely

credit-worthy borrowers.  In addition, card issuers are paid fees by cardholders, including annual

fees, late fees, over credit limit fees, bad check fees, cash advance transaction fees, foreign

exchange fees, and fees for optional protection programs such as insurance.

53.   Merchants, including Plaintiffs, are responsible to pay, and do pay, interchange fees

to issuing banks.  Interchange fees are set based upon the type, size, and identity of the merchant,

not the acquiring bank.  Acquiring banks do not pay interchange fees.

54. Visa and MasterCard operate what is commonly referred to as a four-party, or "open loop," system. Visa and MasterCard do not issue credit cards to cardholders or have a direct relationship with cardholders. Rather, Visa and MasterCard facilitate a combination of issuing banks that have direct relationships with cardholders. Issuing banks, through their membership in Visa and MasterCard, avoid having to negotiate and compete for merchant acceptance individually, while still being guaranteed interchange revenue at the rate set by Visa and MasterCard.

55. Other card networks, such as American Express, traditionally operated a three-party, or "closed-loop," system, which is a simpler system than the four-party systems operated by Visa and MasterCard. For example, in a three-party system, the network issues credit cards directly to cardholders and has a direct relationship with cardholders. Further, in such a system the network negotiates directly with merchants, including with respect to pricing, rather than collectively establishing a default interchange rate for issuing banks that merchants are required to pay.

56. Issuing banks compete for cardholders and card usage by offering numerous credit card products. Cards that offer cash-back, airline miles or other usage benefits are often referred to as "rewards cards." Premium cards, rewards cards that offer the highest levels of rewards, include cards such as Visa Signature Preferred and MasterCard World Elite. Standard or "traditional" credit cards, which do not offer the same array of features to cardholders, include products such as Visa Traditional and the MasterCard Core Value card. Interchange fees for premium credit cards are higher than the interchange fees merchants are charged on other rewards cards, which in turn are higher than those charged on standard credit card transactions. Merchants such as Plaintiffs receive no additional benefits from the higher interchange fees they

must pay on transactions in which those cards are used.  Nevertheless, merchants do not have the ability to refuse to accept rewards cards under the Card Association "Honor all Cards" rule.

57.    Visa and MasterCard attempt to justify charging Plaintiffs higher interchange fees on rewards cards, including premium rewards cards, arguing that rewards cardholders spend more than they would have if they were not using rewards cards.  In fact, Plaintiffs receive no additional benefits from the higher interchange fees they must pay on transactions in which those rewards cards are used.  Nevertheless, merchants do not have the ability to refuse to accept rewards cards under Visa's and MasterCard's Competitive Restraints without refusing to accept all Visa-branded or MasterCard-branded cards.

58.    In order to assist issuing banks to achieve additional interchange revenues, Visa and MasterCard have encouraged and enabled their issuing banks to upgrade or graduate large groups of their cardholders to rewards cards or premium rewards cards that carry higher interchange, often without the cardholders' prior knowledge or consent.  In many cases, cardholders are upgraded or graduated to a higher level card based on the cardholder's past spending history.  Thus, the merchants at which these graduated cardholders shop are required to pay more in interchange fees even though nothing about the cardholders or their spending habits has changed.

59.    In the absence of the Competitive Restraints, and "default" interchange that is set at levels to transfer the cost of rewards to merchants, issuing banks seek to differentiate their products to compete for the significant income generated by cardholder issuances and usage  in order to maintain the significant financial benefits the issuing banks receive from card issuances and usage.  A significant source of issuing bank revenue on card portfolios comes from interest on revolving balances and fees such as annual fees, over limit fees, late fees, bad check fees,

cash advance transaction fees, foreign exchange fees, and fees for optional protection programs such as insurance.  Issuing banks could use these significant sources of revenue to fund cardholder rewards, even with reduced or no interchange fee income.

60.   Cardholders who do not qualify for or who choose not to apply for rewards or premium cards do not benefit from the rewards offered by issuing banks and suffer from the additional costs imposed on merchants by Visa's and MasterCard's "default" interchange rates for such cards.

61.   The interchange fees generated by rewards cards exceed the costs of funding the rewards for those cards.

62.   Rewards cards and commercial cards do not increase the overall amounts individual consumers spend at a merchant.  Rather, they tend to drive consumers to shift the amount they would otherwise spend using a lower cost form of payment (cash, debit cards, or non-rewards credit cards) to the higher cost form of payment (rewards and commercial cards).

63.   Neither Visa nor MasterCard has rules or policies that provide meaningful protection for cardholders from abuse by issuing banks seeking to further increase their already supra-competitive revenues.

64.   Because the card portfolios are a major profit center for issuing banks, they have significant incentive to disregard the rights of cardholders in their issuance and sales practices. In recent years, the financial incentive for banks to maximize such revenue has been demonstrated by the fact that certain issuing banks have repeatedly violated the Consumer Financial Protection Act of 2010 ("CFPA") in their desire to squeeze even greater revenue from the fees, interest, and other income that new cardholders bring with them, especially those who revolve their credit card balances each month, resulting in significant interest paid to the issuing

banks.  J.P. Morgan Chase, Citibank, and Bank of America have all entered into consent orders requiring the payment of significant fines and restitution for violations of the CFPA.  The repeated violations of the CFPA by major issuing banks demonstrate the lengths to which issuing banks will go to gain revenue from cardholders.

65.    The recently disclosed actions of Wells Fargo also demonstrate the lengths to which issuing banks will go to gain revenue from card issuance and depository accounts.  The Consumer Financial Protection Bureau found that between 2011 and 2015 Wells Fargo, a member of both Visa and MasterCard, opened more than 565,000 Visa- and MasterCard-branded credit cards without consent from the named cardholder.  These events, which were induced by the issuing banks' existing compensation and bonus systems and employee quotas for new issuances, confirm the profitability of card issuances.  However, upon information and belief, Visa and MasterCard have not taken any steps to prevent Wells Fargo or other issuing banks from further misconduct or to protect their brands from misuse by Wells Fargo or other issuing banks.

66.    Debit cards are one means for DDA holders to access the money in their DDAs. Pre-paid debit cards allow cardholders to access the funds deposited on the card when it was purchased, or subsequent funds added.  As above, there are two primary forms of authentication in use for debit cards in the United States, signature-based and PIN-based.

67.    Debit cards, and the deposit accounts to which they are tied, bring significant revenue and other value to issuing banks.  In addition to the interchange fees that merchants pay on debit card transactions, issuing banks also reap revenues from overdraft and other fees paid by cardholders and net interest income on deposit account balances.  In light of the ubiquity of debit cards, issuing banks must have the ability to offer debit cards in order to attract consumers to

deposit funds.  Additionally, the use of debit cards to access deposit accounts saves issuing banks money because debit transactions are less costly than check transactions for the issuing banks.

68.   Because debit card transactions promptly withdraw funds from the cardholder's account or from the card balance, rather than allowing a grace period before billing and payment, they differ from credit card transactions in their utility to consumers.  These differences underlay the court's determination in *United States v. Visa U.S.A., Inc.*, 163 F. Supp.  2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), that credit card transactions comprised a separate market from the market for debit card transactions.

## THE COMBINATIONS

69.   Visa and MasterCard until recently were organized as joint ventures of their member issuing banks and acquiring banks.  As members of the joint ventures, the member banks agreed to a collection of restrictive rules, referred to herein as the Competitive Restraints, and to impose those Competitive Restraints on merchants that accept Visa-branded and MasterCard-branded cards.  Among the Competitive Restraints are "default" interchange fees that merchants are required to pay for the privilege of accepting the Card Associations' branded cards.  "Default" interchange fee rates are set by Visa and MasterCard for the benefit of their member issuing banks.  As a result of the Competitive Restraints, the "default" interchange fees are made binding.

70.   As a result of the Competitive Restraints, the "default" interchange fees are binding and prevent the bilateral negotiation of interchange fees between merchants and individual issuing banks.  This is by design.  Both Visa and MasterCard vigorously avoided a system in which true bilateral negotiations of interchange fees - i.e., true competition among issuing banks - are the norm.

71.    Through these joint ventures, the Card Associations and their respective issuing banks collectively have gained market power in the payment card market.  Visa and MasterCard each have thousands of issuing bank members in the United States, and there is significant overlap between these banks because, as MasterCard states in its most recent 10-K, "financial institutions typically issue both MasterCard and Visa-branded payment products." The Competitive Restraints eliminated competition among issuing banks for merchant acceptance and eliminated any possibility that competition between the issuing banks could enable separate terms of acceptance for the cards of each issuing bank.  These Competitive Restraints eliminated the development of competitive markets for merchant acceptance.

72.    The Competitive Restraints enforced by the Card Associations, and the actions taken in furtherance of these restraints, constituted and continue to constitute combinations in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

73.    In 2006 and 2008, respectively, the Card Associations each changed their ownership structures through initial public offerings ("IPOs") wherein the member banks partially divested their ownership of the Card Associations.  But the IPOs did not change the essential character of their combinations, the setting of interchange fees, or the Competitive Restraints.  On the contrary, Visa and MasterCard repeatedly reassured investors, employees,  and members that the IPOs would not cause any significant change, other than with respect to  antitrust liability, stating variously that the restructurings were performed in a way that  "ensure[s] continuity of the core business operations," that existing contracts and rules continue to govern their commercial relationships, that company operations operate "business as usual,"  and that the new governance structure the manner in which interchange rates are set.

74.     The motivation for these IPOs was to limit the appearance that the Card Associations were controlled by their member banks.  According to the prospectus for MasterCard's 2006 IPO, "heightened regulatory scrutiny and legal challenges" underlay the decision to make changes in the ownership structure of MasterCard.  In particular, MasterCard stated that "many of the legal and regulatory challenges we face are in part directed at our current ownership and governance structure in which our customers — or member financial institutions — own all of our common stock and are involved in our governance by having representatives serve on our global and regional boards of directors."

75.     After the IPOs, neither of the Card Associations, nor any of the member banks took any affirmative action to withdraw from the respective combinations.  To the contrary, even after the IPOs, the member banks of the Card Associations continued to agree to and to enforce and adhere to the Competitive Restraints that eliminate competition among issuing banks for merchant acceptance.  The Card Associations have continued to set "default" interchange fees from time to time for the benefit of their issuing bank members.  Thus, even after the IPOs, the Card Associations' members maintained and enforced the Competitive Restraints ensuring that they would not compete for merchant acceptance.

76.     After the IPOs, as before, the Card Associations serve as facilitators and coordinators of horizontal agreements among their member banks to continue to adhere to and enforce "default" interchange fees and the Competitive Restraints.  It would be contrary to the independent self-interest of any single issuing bank to adhere to the Competitive Restraints without the agreement of the remaining issuing banks also to impose and adhere to those restraints.  In the absence of agreements between issuing banks facilitated by Visa and MasterCard that assure supracompetitive interchange rates, issuing banks competed for both

26

merchant acceptance and cardholder issuances by differentiating their card offerings.  Visa and MasterCard.  The Card Associations, by acting as the managers of their respective combinations and coordinating agreements to continue imposing and adhering to the Competitive Restraints, eliminate competition for merchant acceptance among their respective issuing banks.  But for the arrangements facilitated by the Card Associations, the member banks would pursue their own independent self-interest by competing for merchant acceptance of the cards they issue.

77.    Each issuing bank is an independently owned and independently managed business. Each issuing bank is a separate economic actor pursuing separate economic interests.   In other aspects of their businesses, the member banks compete against one another.  For  example, while their membership in Visa and MasterCard caused individual banks to limit the  terms upon which they compete for merchant acceptance, issuing banks compete with one  another for cardholders by creating payment card products that offer an array of interest rates,  annual fees, purchase rewards, and other features that will make their payment cards more  attractive than those offered by other issuing banks.  As found in *United States v. Visa U.S.A.,  Inc.*, cardholders "can choose from thousands of different card products with varying terms and  features, including a wide variety of rewards and co-branding programs and services such as  automobile insurance, travel and reservation services, emergency medical services and purchase  security/extended protection programs." 163 F. Supp. 2d at 334.  These facts continue to be true today.

78.    However, the member banks do not compete for merchant acceptance of the cards they issue.  Instead, both before and after the Card Associations IPOs, the member banks have ceded to the Card Associations decision-making and action with respect to the terms upon which they will allow merchants to accept the cards they issue.  By continuing to agree to and adhere to the Competitive Restraints and default interchange fees, the member banks have deprived the

marketplace of independent centers of decision-making and, therefore, of actual or potential competition.  Such competition decreased the cost of merchant acceptance, but also decreased cardholder costs and/or increased the quality of card offerings available to cardholders.

79.   Further, Visa and MasterCard continue to engage in coordinated and collusive conduct in order to preserve their respective unlawful combinations, particularly when threatened with challenges to the rules that support these unlawful combinations.  For example, when negotiating the now-rejected Class Action Settlement, Visa and MasterCard jointly negotiated and entered into a single agreement.  As a result, neither Defendant agreed to the modification of its anti-surcharge rules in a manner that generated competition for merchant acceptance by issuing banks.  Likewise, in 2010, in negotiating a settlement with the Department  of Justice by which the Visa and MasterCard combinations both amended their rules to allow merchants to offer discounts to consumers in broader circumstances than previously allowed, Visa and MasterCard insisted upon joint negotiations with the Department of Justice, in order to  avoid the modification of either Defendant's anti-discounting rules in a manner that would generate competition for merchant acceptance by issuing banks.

## RELEVANT PRODUCT MARKETS

80.   The relevant product markets are the market for merchant acceptance of general-purpose credit (including charge) cards and the market for merchant acceptance of debit cards. Credit cards and debit cards are not reasonably interchangeable with each other or with other forms of tender.  These markets are each part of two-sided platforms in which issuing banks compete, respectively, for credit card issuance and to gain depository accounts.  The market for merchant acceptance of general-purpose credit cards and the market for merchant acceptance of debit cards are in themselves relevant markets even if the effects from the other side of the

platforms (competition for credit card issuance and to gain depository accounts) are considered. Alternatively, because merchant acceptance and card issuance occur on each side of a two-sided platform, the relevant markets in this case are the market for merchant acceptance and cardholder use of general purpose credit (including charge) cards and the market for merchant acceptance and cardholder use of debit (including prepaid) cards.

81.  Visa and MasterCard do not themselves issue cards (credit or debit), and do not have direct relationships with cardholders.  Accordingly, Visa and MasterCard do not operate to set prices based upon considerations of merchant and cardholder demand.  Instead, they facilitate an agreement among issuing banks to limit competition for merchant acceptance and to fix the fees charged to merchants. The Competitive Restraints described herein impede the ability of merchants to substitute one issuing bank's cards for another's cards.

82.  Banks issuing credit and debit cards compete with one another to issue their cards to consumers (cardholders) who use those cards to purchase goods and services from merchants, although this competition for card issuances is constrained by the Competitive Restraints and the "default" interchange set by Visa and MasterCard.  This competition occurs in the markets for the issuance of credit and debit cards.  Absent the Competitive Restraints, banks issuing such cards would seek access to merchants that are willing to accept their cards as payment for the goods and services the merchants sell to consumers, thus enhancing the value of these cards to cardholders.  As a result, absent the Competitive Restraints at issue in this case, issuing banks would compete over the terms of acceptance of their cards by merchants.

83.  Merchant acceptance of general-purpose credit cards is a relevant product market. A credit card is not interchangeable with a debit card or other form of tender.  Many cardholders desire the ability to access a line of credit, defer payment, or other features offered by the credit

cards. For this reason, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, even in the face of high or increasing interchange fees, without losing sales. The Card Associations and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

84. Alternatively, merchant acceptance and cardholder issuance of general-purpose credit cards together is a relevant product market, with merchants and credit cardholders the customers on either side of the two-sided platform in which this market operates. For both cardholders and merchants, a credit card is not interchangeable with a debit card or other form of tender. Many cardholders desire the ability to access a line of credit, defer payment, or desire other features offered by credit cards, and therefore debit cards are not a substitute for cardholders in this market. Because debit cards are not a substitute for credit cards on the cardholder side of this platform, Plaintiffs and other merchants cannot discontinue acceptance of credit cards, or substitute debit card acceptance for credit card acceptance without losing sales, even in the face of high or increasing interchange fees. Visa and MasterCard and their credit card issuing members are not constrained in the charges they impose for merchant acceptance of credit cards by the availability of debit cards and other forms of tender as payment options.

85. Merchant acceptance of debit cards is also a relevant product market. Debit cards are not reasonably interchangeable with credit cards and other forms of tender. Debit cards differ from credit cards in significant ways. Debit cards must be tied to a bank account, or pre-paid, unlike credit cards. When a debit card is used, the funds are withdrawn from the cardholder's account generally the same day or within a few days. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or

checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Thus, merchants cannot discontinue acceptance of debit cards.

86. Alternatively, merchant acceptance and cardholder issuance of general-purpose debit cards together is a relevant product market, with merchants and debit cardholders the customers on either side of the two-sided platform in which this market operates. For both cardholders and merchants, a debit card is not interchangeable with a credit card or other form of tender. Consumers who desire to pay for a transaction with immediately available funds may not want to carry large amounts of cash or checks on their person, and not all merchants accept checks. Consumers who cannot qualify for credit cards or have reached the credit limit on their credit cards may also prefer the use of debit cards to other options. Because credit cards are not a substitute for debit cards on the cardholder side of this platform, Plaintiffs and other merchants cannot discontinue acceptance of debit cards, or substitute credit card acceptance for debit card acceptance without losing sales, even in the face of high or increasing interchange fees. Visa and MasterCard and their debit card issuing members are not constrained in the charges they impose for merchant acceptance of debit cards by the availability of credit cards and other forms of tender as payment options.

87. Debit cards are also regulated separately and differently from credit cards. In 2011, pursuant to the Durbin Amendment, the Federal Reserve Board imposed a maximum level for debit card interchange fees charged by large banks. The legislation did not mandate that the Federal Reserve Board regulate interchange fees charged in connection with credit card transactions.

88.     Visa, MasterCard, and their debit card issuing members are not constrained in the charges they impose on merchants for debit card acceptance by the availability of credit cards or other forms of tender as a payment option.

## RELEVANT GEOGRAPHIC MARKET

89.     The relevant geographic market for each product market is the United States and its territories.

90.     The default interchange fees are set by the Card Associations, respectively, on a national basis.  Similarly, the Competitive Restraints are specific to the United States and its territories.

91.     The Competitive Restraints imposed on Plaintiffs require that it accept all cards of all issuing banks who are members of the Card Associations at "default" interchange fees at all of their outlets throughout the United States.

92.     The Card Associations, and their largest issuing banks, advertise nationally and pursue promotional strategies aimed at the United States as a whole.

## DEFENDANTS' COMPETITIVE RESTRAINTS

93.     On behalf of the issuing banks that are their members, the Card Associations each have adopted and imposed supra-competitive "default" interchange fees and other Competitive Restraints on Plaintiffs that eliminate competition. These Competitive Restraints prevent competition among the issuing banks for transaction volume from merchants. As a result, the Competitive Restraints cause Plaintiffs' costs of acceptance to be higher than would prevail in a competitive market, and cause merchant acceptance to be lower.  The higher cost of acceptance is not offset by cardholder benefits that would not be available in the absence of these higher costs.  For example, cardholder rewards such as cash back or airline miles could be readily

funded by the other revenue issuing banks gain from the use of payment cards if interchange fees to merchants were reduced to a competitive level.  Further, cardholders would benefit from the elimination of the Competitive Restraints because the elimination of those rules  and practices, in addition to reducing interchange fees to merchants, would increase competition  among issuing banks for card issuances, and lead to lower fees or interest rates, or other benefits,  such as more innovative products, for cardholders.

94.    Collective Setting of Interchange Fees.  The Card Associations set so-called "default" interchange fees on credit card and debit card transactions that merchants are required to pay to their issuing banks.  The collective setting of "default" interchange fees and other Competitive Restraints constitute the fixing of prices within the meaning of the Sherman Act.

95.    The Card Associations each have established complex "default" interchange fee schedules.  Default interchange includes not just the fee levels but also the structure of the fees, including the setting of performance thresholds or tiers and interchange fee categories.  In setting the interchange fees that are paid to their member banks, the Card Associations each act as the manager of its respective combination, setting the price that merchants pay for card acceptance. Interchange fees account for the largest portion of merchant costs for accepting such cards.

96.    Interchange fees are not set to recover the Card Associations' costs of providing network services.  Interchange is a fee that the Card Associations, respectively, acting in combination with the issuing banks, require merchants to pay to the issuing banks.

97.    Visa purports to set non-binding "default" interchange fees.  Visa Core Principle No. 10.3 provides that "[i]nterchange reimbursement fees are determined by Visa . . . or may be customized where members have set their own financial terms for the Interchange of a  Visa transaction or Visa has entered into business agreements to promote acceptance and card  usage."

98.    Contrary to Visa's representations, "default" interchange rates set the prices all issuing banks charge merchants accepting their cards.  Because of the Competitive Restraints, bilateral negotiations between a merchant, or group of merchants, and an issuer simply do not occur.

99.    Both before and after its IPO, Visa has corrupted the process of setting its purportedly default interchange fees by acting to maximize revenue for its unlawful combination of issuing banks, thereby preventing competition among issuing banks from reducing those fees. The interests of issuing banks have been Visa's paramount concern during the period of time relevant to the Complaint.

100.   The process by which "default" interchange fees are determined by Visa is not intended to, and does not, maintain pricing equilibrium in a two-sided platform between cardholders and merchants.  Instead, "default" interchange rates are set by Visa with the objective of maximizing profits among its issuing banks.  Visa admits that it earns revenue only if issuing banks make a profit and framed its setting of "default" interchange based solely on creating financial incentives to increase issuing banks' revenues.  Specifically, Visa sets "default" interchange fees at a level that seeks to avoid the exit of issuing banks from the illegal combination and competing with the networks, rather than to address merchant and cardholder demand.  Further, in setting "default" interchange fees, Visa seeks to transfer costs to merchants, such as the risk of cardholder default, that in a competitive market would not be borne by merchants.

101.   In determining the performance thresholds, merchant categories and structure of fees that are applied to a merchant, Visa acted on behalf of the members of its  unlawful combination, permitting individual issuing banks and groups of issuing banks avenues  to collude

to ensure that merchants do not gain more advantageous interchange fees by being placed into a lower-cost tier.

102. MasterCard also purports to set non-binding "default" interchange fees. MasterCard Rule 9.3 provides: "[a] Transaction cleared and settled between Customers gives rise to the payment of the appropriate interchange fee or service fee, as applicable. The Corporation has the right to establish default interchange fees and default service fees (hereafter referred to as 'interchange fees' and 'service fees,' or collectively, 'fees'), it being understood that all such fees set by the Corporation apply only if there is no applicable bilateral interchange fee or service fee agreement between two Customers in place. . . . Unless an applicable bilateral interchange fee or service fee agreement between two Customers is in place, any intraregional or interregional fees established by the Corporation are binding on all Customers."

103. Contrary to MasterCard's representations, "default" interchange rates set the prices all issuing banks charge merchants accepting their cards. Because of the Competitive Restraints, bilateral negotiations between a merchant, or group of merchants, and an issuer simply do not occur.

104. Both before and after its IPO, MasterCard has corrupted the process of setting its purportedly default interchange fees by acting to maximize revenue for its unlawful combination of issuing banks, thereby preventing competition among issuing banks from reducing those fees. The interests of issuing banks have been MasterCard's paramount concern during the period of time relevant to the Complaint.

105. The process by which "default" interchange fees are determined by MasterCard is not intended to, and does not, maintain pricing equilibrium in a two-sided platform between cardholders and merchants. Instead, "default" interchange rates are set by MasterCard with the

objective of maximizing revenue for issuing banks.  Specifically, MasterCard sets "default" interchange fees at a level that seeks to avoid the exit of issuing banks from the illegal combination and competing with the networks, rather than to create equilibrium between cardholders and merchants.  Further, in setting "default" interchange fees, MasterCard seeks to transfer costs to merchants, such as the risk of cardholder default, that in a competitive market would not be borne by merchants.

106. In determining the performance thresholds, merchant categories and structure of fees that are applied to a merchant, MasterCard has acted on behalf of the members of its unlawful combination, permitting individual issuing banks and groups of issuing banks avenues to collude to ensure that merchants do not gain more advantageous interchange fees by  being placed in a lower-cost tier.

107. Visa and MasterCard have, by the setting of "default" interchange fees and the Competitive Restraints, prevented merchants, acquiring banks, and processors from negotiating interchange and other fees by removing economic incentives for such negotiations and any leverage they might have with issuing banks.  Without the presence of "default" interchange rates, merchants would have sufficient leverage to negotiate or otherwise attain competitive interchange and other fees with issuing banks.  Further, without the presence of "default" interchange rates, acquiring banks and processors would have an economic incentive to serve as a channel through which merchants could reduce their costs of acceptance.  In such competitive markets for merchant acceptance, acquiring banks and/or processors would act as agents for cost of acceptance, including interchange fees, in competing with other acquiring banks and processors for merchant contracts.  Under the current Competitive Restraints, acquiring banks that do not deduct the applicable interchange fee when submitting a transaction for authorization,

clearance, and settlement are subject to fines assessed by Visa and MasterCard.   Both Visa's and MasterCard's rules, quoted above, fix interchange fees, because the other Competitive Restraints remove any possible independent competition among issuing banks in the setting of interchange fees.   Thus, acquiring banks and processors, under current rules, act as enforcers of Visa's and MasterCard's Competitive Restraints rather than as agents for merchants in gaining lower interchange and other fees.

108. "Default" interchange fees do not benefit cardholders.   Without an agreement to eliminate price competition between issuing banks on the merchants' cost of acceptance, individual issuing banks would nevertheless have incentive to differentiate their products and fund rewards or other features of equal or greater benefit to cardholders, given the significant revenue issuing banks earn from card issuances and the loans generated by those  cards.   In the absence of such a system, issuing banks would increase competition for card issuances through innovative products and card features.

109.  Absent the Competitive Restraints, Plaintiffs would pay interchange fees for acceptance, if at all, as determined by competition among issuing banks for merchant acceptance. In the cartelized markets created by the Card Associations combinations, Visa and MasterCard, acting for their member banks, establish interchange fee schedules for their member banks. Plaintiffs are among the merchants injured by this collective setting of interchange fees by the Card Associations.

110.  Honor All Cards Rules:  These rules require in relevant part that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, no matter which bank issued the card or the card type. Similarly, a merchant that accepts Visa-branded or MasterCard-branded debit cards, must accept

all Visa-branded or MasterCard-branded debit cards, no matter the issuing bank. Because of the Honor All Cards Rules, Plaintiffs cannot reject any or all of the types of cards issued by any particular issuing bank. Thus, Plaintiffs are precluded from gaining the benefits of competition as to the terms upon which it will accept or reject the cards of any issuing bank that is a member of Visa or MasterCard. As a result, the "default" interchange fees become binding on Plaintiffs.

111. In addition, these Honor All Cards Rules require that a merchant that accepts any Visa-branded or MasterCard-branded credit card must accept all Visa-branded or MasterCard-branded credit cards, regardless of the rate of interchange or network fees charged on the card. Thus, the rules require merchants, as a condition of accepting any Visa-branded or MasterCard-branded credit cards, to accept higher-cost cards such as rewards cards or commercial cards. This requirement, as shown by issuing banks' conversion of non-rewards cards to reward cards, not only shifts the cost of rewards from issuing banks to merchants, but also allows issuing banks to gain supracompetitive profits on such cards by receiving revenue that exceeds the cost of rewards and preventing competition for cardholder acceptance. As a result, the "default" interchange and network fees not only become binding on Plaintiffs, but Plaintiffs are obligated to pay higher fees for cards it might otherwise choose not to take as a condition of accepting any Visa-branded or MasterCard-branded credit cards.

112. All Outlets Rules: The All Outlets Rules require merchants who accept Visa-branded or MasterCard-branded payment cards to accept those cards at all of their merchant locations. A merchant is not permitted to accept the cards at some stores but not others. These rules preclude merchants from gaining the benefits of competition as to the terms of acceptance by location (for example, by region of the country). These rules also prevent cardholders from

receiving the benefit of innovative approaches to payments that merchants may want to test at individual locations before implementing company wide.

113. Prior to January 27, 2013, the All Outlets Rules required merchants that operated under multiple banners (e.g., trade names or name plates) and that accepted Visa-branded or MasterCard-branded payment cards to accept those cards at all of their banners.  This rule precluded merchants from gaining the benefits of competition as to the terms of acceptance with issuing banks by banner or by locations within a banner.

114. Changes that Visa and MasterCard made to their All Outlets Rules implemented after January 27, 2013, do not diminish the anticompetitive effects or the injuries Plaintiffs continue to suffer.  The All Outlets Rules still require that if a merchant elects to accept  Visa-branded or MasterCard-branded cards at one of its banners, it must accept all such cards at  all locations of that banner, and it must accept all such cards no matter the card issuer. Merchants also cannot accept the cards of some issuers but not others at a particular location.  Moreover, the January 27, 2013 rules changes were implemented in compliance with the MDL 1720 Class Action Settlement.  Because that settlement has been overturned, Visa may try to rescind these rules changes.

115. No Discount Rules:  Under the No Discount Rules, merchants were only allowed to offer discounts to customers who paid in cash, rather than using a payment card.   However, pursuant to a settlement with the United States Department of Justice, as of July 20, 2011, the Card Associations changed their rules to allow merchants to offer discounts to consumers in some limited circumstances.  These changes to the No Discount Rules have not significantly diminished the anticompetitive effects of the Competitive Restraints as merchants are required to discount all credit card networks equally.  While the Card Associations now allow merchants

more discounting options, merchants still are prohibited from offering discounts to consumers for using the cards issued by particular issuing banks or, where such ability exists, have been deterred from doing so by the Competitive Restraints. A merchant's ability to utilize issuer-specific discounts would be an important tool for gaining the benefits of competition as to the terms of acceptance with an issuing bank.

116. Visa's and MasterCard's No Discount Rules harm cardholders by precluding them from receiving the benefit of incentives merchants would offer in order to induce cardholders to use a lower cost form of payment.

117. No Surcharge Rules:  The No Surcharge Rules prohibit merchants from surcharging transactions in which a consumer used a Visa-branded card or a MasterCard-branded card. These rules eliminate a merchant's ability to utilize surcharging as a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank. Absent the rules, a merchant could surcharge a transaction in which the consumer uses the card of a particular issuing bank, such as one that demanded a high interchange fee. As of January 27, 2013, the Card Associations altered their No Surcharge Rules to permit merchants to surcharge credit card customers under limited circumstances. Debit card transactions still may not be surcharged under the rule modification. Changes to the No Surcharge Rules for credit cards implemented after January 27, 2013 do not eliminate their anticompetitive effects or the injuries Plaintiffs continue to suffer. Even as modified, the No Surcharge Rules prohibit a merchant from surcharging based on the identity of the card issuer. However, at least ten (10) states have laws that prohibit surcharging. Moreover, the January 27, 2013 rules changes were implemented in compliance with the MDL 1720 Class Action Settlement. Because that settlement has been overturned, Visa and MasterCard may try to rescind these rules changes.

118. Anti-Discrimination Rules: The Anti-Discrimination Rules prohibit merchants from taking actions that might favor the use of one type or category of credit card or debit card, or one issuing bank's card, over another credit card or debit card.

119. Visa's and MasterCard's Anti-Discrimination Rules harm cardholders by precluding them from receiving the benefit of merchant strategies that reward cardholders for using a lower cost form of payment. No Competing Marks Rules: The No Competing Marks Rules prohibit the use of competitive marks on Visa-branded or MasterCard-branded cards.  These rules prevent the issuance of cards on which a merchant might reduce its cost of acceptance by routing a transaction to the general-purpose payment network with the lower cost of acceptance.  Visa and MasterCard revised their rules to allow multiple PIN debit marks on cards to comply with the Durbin Amendment and its implementing regulations.  The No Competing Marks Rules eliminate a merchant's ability to utilize legitimate efforts to incentivize cardholders to use the lowest cost form of payment available, thereby depriving the merchant of a tool in gaining the benefits of competition as to the terms of acceptance with an issuing bank.

120. Visa's and MasterCard's No Competing Marks Rules harm cardholders by precluding them from receiving the benefit of merchant strategies that incentivize cardholders to use a lower cost form of payment.

121. No Bypass Rule: Visa's No Bypass Rule prohibits issuing banks and acquirers from bypassing the VisaNet system when processing transactions on Visa-branded cards.  This rule prevents an issuing bank and an acquiring bank from competing for merchant acceptance through lower acceptance costs by directly routing transactions between the two banks and bypassing the VisaNet system.  In combination with other Competitive Restraints, this  rule prevents merchants from seeking to lower their cost of acceptance by steering customers to use

payment cards in which the issuing bank and the acquiring bank are the same or have entered into an agreement to route transactions directly between the banks, without using the VisaNet system.

122. The Competitive Restraints, individually and in combination, eliminate issuing bank competition for merchant acceptance. In the absence of these rules, the market for merchant acceptance would be competitive. Alternatively, in the absence of the rules, both the merchant acceptance side of the payments platform and the card issuance side of the payments platform would become more competitive. Plaintiffs and the issuing banks would be able to gain the benefits of competition as to the terms under which Plaintiffs would accept an issuing bank's cards, including the amount of interchange fees — if any — Plaintiffs would pay on transactions involving an issuing bank's cards. Competition among issuing banks for merchant acceptance would result in lower interchange fees for Plaintiffs and allow Plaintiffs to enhance the value its customers receive. Further, as described above, in the absence of the Competitive Restraints, issuing banks would compete more vigorously and on broader terms for cardholder issuances, resulting in equal or greater benefit to cardholders than exists under the Competitive Restraints.

123. The Honor All Cards Rules, the No Discount Rules, the No Surcharges Rules, the Anti-Discrimination Rule, the No Competing Marks Rule, the No Bypass Rule, and the All Outlets Rules, individually and in combination, eliminate the incentives for the Card Associations to compete for merchant acceptance through setting lower "default" interchange fees, make it impossible for Plaintiffs to negotiate for better rates, and do not provide cardholders benefits that would not be available in the absence of these restraints.

124. In addition to the Competitive Restraints, a variety of other rules and regulations (often not publicly disclosed) enforced by the Card Associations and their member banks also

operate to support the anticompetitive effects of the Competitive Restraints and imposition of "default" interchange fees on Plaintiffs.

125.  The Competitive Restraints, including the collective setting of "default" interchange fees, are not reasonably necessary to accomplish any legitimate efficiency- generating objectives of the Card Associations' combinations.  Furthermore, there exist numerous alternative means that are less harmful to competition by which any such objectives could be accomplished.

## DEFENDANTS' MARKET POWER

126.  Visa and its issuing banks jointly have market power in the relevant market for merchant acceptance of general-purpose credit cards in the United States and its territories.

127.  In 2001, in *United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court found that Visa had market power in the market for credit card network services with a 47% share of the dollar volume of credit card transactions in the United States.  In 2003, in *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965, *12 (E.D.N.Y. Apr. 1, 2003), the court reaffirmed that Visa had market power in the credit card market based on a finding that its market share fluctuated between 43% and 47%, as well as the barriers to entering the relevant product market. Visa's share of the credit card market has not changed significantly since these two holdings.  The prior judicial findings of market power demonstrate that Visa has market power in the general-purpose credit card market.

128.  The two-sided nature of the payment's platform increases both Visa's and MasterCard's market power with respect to cost of acceptance for merchants.  Because of the two-sided nature of the platform, combined with Visa's and MasterCard's Competitive Restraints, cardholders who choose the form of payment to tender have had no visibility to the

43

cost to merchants of that form of payment.  Visa's and MasterCard's Competitive Restraints have prevented merchants from educating cardholders as to such costs and severely limit merchants' ability to incentivize cardholders to use a lower cost form of payment.  These circumstances have reinforced and enhanced Visa's and MasterCard's market power,

129.  There are significant barriers to entry into the market for general purpose credit cards.  Indeed, the court in *United States v. Visa U.S.A., Inc.,* 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), specifically found that there are high barriers to entry into the general-purpose credit card market.  Visa's former CEO described starting a new card network as a "monumental" task involving expenditures and investment of over $1 billion.  Both AT&T and Citibank conducted entry analyses but decided it would be unprofitable to attempt to start a competing general-purpose credit card business.  *Id*. at 342.

130.  The difficulties associated with entering the network market are exemplified by the fact that no company has entered the market since Discover did so in 1985. Discover has never achieved more than a 7% share of the general-purpose credit card market and remains at a current market share of approximately 5%.

131.  Visa's conduct is direct evidence of its market power and that of its issuing banks. Interchange fees are set by Visa on behalf of its issuing banks.  Visa promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, Visa's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

132.  Visa's "default" credit interchange fees demonstrate Visa's market power. Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have

fallen for its member banks and even as interchange fees for debit cards have fallen.   Despite these increases, merchants have not stopped accepting Visa credit cards.  Further, Visa's market power is demonstrated by its ability to discriminate in price among types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

133.  Visa's market power in credit cards is also demonstrated by the fact that when the Federal Reserve Board significantly reduced the interchange fees on debit transactions, few, if any, merchants chose to stop accepting Visa credit cards, and Visa did not reduce its credit card interchange fees.  In 2012, the first full year after implementation of reduced interchange fees on debit transactions, Visa credit card transactions and purchase volume increased.

134.  Competition with MasterCard does not eliminate Visa's exercise of market power in the market for merchant acceptance of general-purpose credit cards.  During the period that the Card Associations were both joint ventures consisting of their member banks, they adopted parallel rules that limited competition for merchant acceptance.  After their respective IPOs, the Card Associations' membership, rules, and their power to obtain high interchange fees from merchants have not changed and continue to constrain competition between the Card Associations and among the members of both combinations.

135.  Within the market for merchant acceptance of credit cards, Visa-branded credit cards and MasterCard-branded credit cards do not constrain one another in competition for merchant acceptance.  Merchants have no meaningful alternative but to accept both Visa and MasterCard because Visa's and MasterCard's anticompetitive rules prevent merchants from influencing cardholders' choice of payment method.

45

136.  MasterCard and its issuing banks jointly have market power in the relevant market for merchant acceptance of general-purpose credit cards in the United States.

137.  In *United States v. Visa U.S.A., Inc*., 163 F. Supp. 2d 322, 341 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003), the court held that MasterCard's 26% share of dollar volume of credit and charge card transactions was sufficient to demonstrate that it had market power in the market for credit card network services.  In *In re Visa Check/MasterMoney Antitrust Litigation*, 2003 U.S. Dist. LEXIS 4965, *12 (E.D.N.Y. Apr. 1, 2003), the court held that MasterCard's 26% to 28% share of the credit card market was sufficiently high to go to a jury on the question of MasterCard's market power.  MasterCard's share of the credit card market has not changed significantly since those decisions.

138.  MasterCard's conduct is direct evidence of its market power and that of its issuing banks.  Interchange fees are set by MasterCard on behalf of its issuing banks. MasterCard also promulgates and enforces the Competitive Restraints, which prevent competition among its issuing banks for merchant acceptance.  Absent the Competitive Restraints, MasterCard's credit card issuing banks would gain the benefits of competition as to the terms of merchant acceptance, including interchange fees, and Plaintiffs would benefit through lower interchange fees and other benefits from competition.

139.  MasterCard's "default" credit interchange fees demonstrate MasterCard's market power.  Effective credit card interchange fees have risen over time, even as the costs of issuing credit cards have fallen for its member banks and even as interchange fees for debit cards have fallen.  Despite these increases, merchants have not stopped accepting MasterCard credit cards.  Further, MasterCard's market power is demonstrated by its ability to discriminate in price among

types of merchants, by distinguishing merchants by size, transactions by size, cards by type, and merchants by retail category.

140. Competition with Visa does not eliminate MasterCard's exercise of market power in the market for merchant acceptance of general-purpose credit cards either. During the period that Visa and MasterCard were joint ventures consisting of their member banks, they adopted rules that limited competition for merchant acceptance. After their respective IPOs, the Card Associations' membership, rules, and most importantly power to obtain high interchange fees from merchants did not change and continue to constrain competition between the Card Associations and among the members of both combinations.

141. As alleged above, there are significant barriers to entry into the market for the provision of general-purpose payment card network services to merchants

142. The debit card market is dominated by the Card Associations. Combined, the Card Associations comprised about 75% of all debit purchase volume in 2004 and comprise over 80% today. Only Visa, MasterCard, and Discover allow signature authorization of debit transactions.

143. Visa, jointly with its issuing banks, and MasterCard, jointly with its issuing banks, each exercise market power in the market for merchant acceptance of debit cards.

144. Visa and its issuing banks jointly have market power in the market for acceptance of debit cards. Visa participates in and manages a combination comprised of the vast majority of issuing banks of debit cards, such that merchants are unable to refuse to accept Visa- branded debit cards. This combination of issuing banks combined with the Competitive Restraints gives Visa market power. Visa has exercised and continues to exercise market power by requiring Plaintiffs to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

145. Visa's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept Visa debit cards as a condition of accepting Visa credit cards was dropped in 2003, there is no evidence that merchants were able to stop accepting Visa  debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011, the Federal Reserve Board found that Visa's debit interchange rates were significantly above cost. Because of Visa's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

146. As with credit cards, within the market for merchant acceptance of debit cards, Visa-branded debit cards and MasterCard-branded debit cards do not constrain one another in competition for merchant acceptance.  Merchants have no meaningful alternative but to accept both Visa and MasterCard debit cards because Visa's and MasterCard's anticompetitive rules prevent merchants from influencing cardholders' choice of payment method.

147. Despite provisions in the Durbin Amendment and the Federal Reserve Board's implementing regulations that provide merchants with routing options for debit card  transactions (attempting to promote competition between different debit networks), Visa and  MasterCard have taken affirmative steps including, but not limited to, the imposition of the Fixed Acquirer Network Fee ("FANF") and other fees and rules/policies (including but not limited to implementation of the Transaction Integrity Fee and the elimination of credit vouchers), to circumvent competition between debit networks, and thereby have prevented their respective brands of debit cards from constraining one another in the market for merchant acceptance.

148. MasterCard and its issuing banks jointly have market power in the market for acceptance of debit cards.  MasterCard participates in and manages a combination comprised of a significant fraction of all issuers of debit cards, such that merchants are unable to refuse to

accept MasterCard-branded debit cards.  This combination of issuing banks combined with the Competitive Restraints gives MasterCard market power.  MasterCard has exercised and continues to exercise market power by requiring Plaintiffs to pay supra-competitive interchange fees and by imposing the Competitive Restraints.

149. MasterCard's market power over merchants is demonstrated by the fact that, when the tie forcing merchants to accept MasterCard debit cards as a condition of accepting MasterCard credit cards was dropped in 2003, few or no merchants stopped accepting MasterCard debit cards despite the availability of lower cost PIN debit networks.  In addition, in 2011, the Federal Reserve Board found that MasterCard's debit interchange rates were significantly above cost.  Because of MasterCard's Competitive Restraints, merchants cannot gain the benefits of competition among issuing banks for terms of debit card acceptance.

## COMPETITIVE INJURY

150. Visa and MasterCard use their market power to impose "default" interchange fees and the Competitive Restraints on Plaintiffs.

151. The Competitive Restraints make it impossible for Plaintiffs to gain the benefits of competition as to the terms of acceptance, including lower interchange fees with individual issuing banks.  The Competitive Restraints provide a mechanism for issuing banks to avoid competing for acceptance.  Absent the supra-competitive "default" interchange fees and the other Competitive Restraints, Plaintiffs would be able to gain the benefits of competition as to interchange fees, which would reduce them to a competitive level.  The changes to the Competitive Restraints that were instituted as a result of prior settlements and enforcement actions have not eliminated the market power of the combinations and have not curtailed the level or rise in effective interchange fees being paid by merchants.  Plaintiffs have been harmed

by the actions of the Card Associations combinations.  The amount of interchange fees paid by Plaintiffs are supra-competitive.  Merchants such as Plaintiffs are harmed by the combinations' anticompetitive conduct, including the imposition of "default" interchange fees.

152. Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output by increasing merchant costs (which leads to higher prices and/or the loss of consumer welfare for customers), reducing merchant acceptance, and constraining innovation.  If issuing banks competed with each other on both sides of the platform, rather than eliminating competition by agreeing to the Competitive Restraints and "default" interchange, merchants would benefit from lower acceptance costs, which would be used by merchants to compete for consumers, and issuing banks would compete vigorously with each other for cardholder issuance and usage, which would increase consumer welfare.  If issuing banks competed on both sides of the platform, consumers would benefit on both sides of the platform.

153. But for the Competitive Restraints, competition among issuing banks for merchant acceptance would result in lower interchange fees.  Plaintiffs would have the opportunity to use the strategies they use in other parts of its business to obtain competitive acceptance terms.  As a result of the Competitive Restraints, card acceptance is a significant cost to Plaintiffs' business and they has no ability to gain lower costs in a competitive market.

154. Plaintiffs have accepted Visa-branded and MasterCard-branded credit and debit cards between 2004 to the present.  Accordingly, Plaintiffs have been forced to abide by Visa's and MasterCard's unlawful Competitive Restraints and has been forced to pay supra-competitive interchange fees, all to its detriment.

## CLAIMS FOR RELIEF

**COUNT 1: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Credit Cards**

155. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

156. The use of credit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

157. Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act.  Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act.  Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO.  Visa has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by Visa members.  Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues.  It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly, not to compete.

158. Cardholders do not gain countervailing benefits to the harm caused merchants through the Competitive Restraints and "default" interchange.  Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

159.  In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn.  In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

160.  Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

161.  As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of general-purpose credit cards.

162.  Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of Visa-branded credit cards, in violation of Section 1 of the Sherman Act.

163.  Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards. The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition

among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

164. Visa's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Visa-branded credit cards, regardless of the cost of acceptance for different categories of such cards.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards on an all-or-nothing basis, regardless of whether the card is a basic card, a rewards card, or a commercial card.  Each type of card, however, is a separate product with different costs to merchants.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards.  By unlawfully forcing merchants to accept Visa-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants. But for the Honor All Cards Rules' requirement that merchants accept all types of Visa-branded credit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

165. Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  This further eliminates merchant acceptance as one of the areas of

competition among issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks,  to lower their costs of acceptance.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards, without reducing the benefits cardholders now receive.

166. Visa's setting of "default" interchange fees for the acceptance of Visa-branded credit cards further prevents the cost of acceptance from being determined between Plaintiffs and the various individual issuing banks in a competitive market.  Instead, Visa's supra-competitive interchange fees are set collectively by Visa in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default interchange" fees for Visa-branded credit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuer.

167. As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and decreased consumer welfare.

**COUNT 2: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Visa's Competitive Restraints Governing Debit Cards**

168. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

169. The use of debit cards issued by members of Visa and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

170. Visa and its member banks are a combination within the meaning of Section 1 of the Sherman Act. Visa's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. Visa's Competitive Restraints, as defined above, constitute horizontal agreements among Visa and its members both prior to and after Visa's reorganization and IPO. Visa has served and continues to serve as the manager of a combination that limits competition between the bank members of the combination through the rules governing debit cards agreed to by Visa members. Accordingly, by these arrangements, Visa has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by Visa, similarly, not to compete.

171. In addition, Visa's rules and related contracts entered into before the Visa IPO constituted a horizontal agreement from which Visa and the member banks have never withdrawn. In changing its corporate form at the time of the IPO, Visa did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rule and agreements.

172.  Alternatively, after the Visa IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

173.  As alleged above, Visa and its members jointly have market power in the market for merchant acceptance of debit cards.

174.  Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of Visa-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

175.  Visa's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the Visa-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the price of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule does not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

176.  Visa's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all Visa-branded debit cards, regardless of the cost of acceptance

for different categories of such cards.  Under the Honor All Cards Rules, Visa affords merchants no choice but to accept Visa-branded cards on an all-or-nothing basis, regardless of whether the card is a consumer card or a commercial card.  Each type of card, however, is a separate product with different costs to merchants.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards.  By unlawfully forcing merchants to accept the Visa-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants.  But for the Honor All Cards Rules' requirement that merchants accept all types of Visa-branded debit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule does not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

177.  Visa's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting  the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

178.  Visa's setting of "default" interchange fees for the acceptance of Visa-branded debit cards further prevents the cost of acceptance from being determined between Plaintiffs and the various individual issuing banks in a competitive market.  Instead, Visa's supra-competitive interchange fees have been set collectively by Visa in conjunction with or on behalf of all of its

57

member issuing banks. Absent the setting of "default" interchange fees for Visa-branded debit cards by Visa and the other Competitive Restraints managed by Visa, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

179.  The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of Visa's setting of "default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition of supra-competitive debit interchange fees may be reduced by the regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance.  Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supra-competitive interchange fees on Visa debit card transactions.

180.  Visa's attempt to circumvent the effects of the Durbin Amendment and the regulations implementing that statute through the imposition of the FANF, together with other fees and restrictions (including but not limited to the implementation of the Transaction Integrity Fee and the elimination of credit vouchers) further raised Plaintiffs' costs of acceptance for Visa debit transactions through the anticompetitive elimination of lower-cost options that otherwise would have been available to merchants.

181.  As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of Visa's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

**COUNT 3: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Mastercard's Competitive Restraints Governing Credit Cards**

182. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

183. The use of credit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

184. MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing credit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the credit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, similarly, not to compete.

185. Cardholders do not gain countervailing benefits to the harm caused to merchants through the Competitive Restraints and "default" interchange. Indeed, as set forth above, the restraints harm competition on both sides of the platform by raising prices to cardholders, reducing output (including reducing consumer acceptance), and constraining innovation.

186.  In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn.  In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements.  Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

187.  Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

188.  As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of general-purpose credit cards.

189.  Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix the price of acceptance of MasterCard-branded credit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of credit cards, in violation of Section 1 of the Sherman Act.

190. MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept cards from its issuing banks on an all-or-nothing basis.  Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing

banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the cost of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

191.  MasterCard's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all MasterCard-branded credit cards, regardless of the cost of acceptance for different categories of such cards.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards on an all-or nothing basis, regardless of whether the card is a basic card, a rewards card, or a commercial card.  Each type of card, however, is a separate product with different costs to merchants.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards.  By unlawfully forcing merchants to accept MasterCard-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants.  But for the Honor All Cards Rules' requirement that merchants accept all types of MasterCard-branded credit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with rewards at levels comparable to the levels now available.

192.  MasterCard's other Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to the fees paid to particular issuing banks.  Absent these rules, merchants would have been able to

(and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks. But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for credit cards.

193. MasterCard's setting of "default" interchange fees for the acceptance of MasterCard-branded credit cards further prevents the cost of acceptance from being determined between Plaintiffs and the various individual issuing banks in a competitive market.  Instead, MasterCard's supra-competitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for MasterCard-branded credit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

194. As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of credit cards by merchants, which are the result of MasterCard's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of credit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

### COUNT 4: Violation of Section 1 of the Sherman Act, Collectively and Separately, by Mastercard's Competitive Restraints Governing Debit Cards

195. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

196. The use of debit cards issued by members of MasterCard and the rules governing the use of such cards occur in and have a substantial anticompetitive effect on interstate commerce.

197. MasterCard and its member banks are a combination within the meaning of Section 1 of the Sherman Act. MasterCard's rules and related contracts constitute agreements within the meaning of Section 1 of the Sherman Act. MasterCard's Competitive Restraints, as defined above, constitute horizontal agreements among MasterCard and its members both prior to and after MasterCard's IPO. MasterCard has served and continues to serve as the manager of a combination that limits competition among the bank members of the combination through the rules governing debit cards agreed to by MasterCard members. Accordingly, by these arrangements, MasterCard has facilitated and continues to facilitate a horizontal agreement among its members, which would otherwise compete for merchant acceptance of the debit cards each issues. It would be contrary to the independent self-interest of individual issuing banks to forgo the ability to compete for merchant acceptance in the absence of an agreement with other issuing banks, managed by MasterCard, to similarly not compete.

198. In addition, MasterCard's rules and related contracts entered into before the MasterCard IPO constituted a horizontal agreement from which MasterCard and the member banks have never withdrawn. In changing its ownership structure at the time of the IPO, MasterCard did not take any affirmative action to end its existing anticompetitive arrangements, either by communicating to its members a decision to withdraw from the rules and agreements with its members or by taking any other steps to effectuate withdrawal from the rules and agreements. Nor did its members take any steps to withdraw from the rules and agreements or take any other steps to effectuate withdrawal from the rules and agreements.

199. Alternatively, after the MasterCard IPO, the Competitive Restraints constitute vertical agreements in restraint of trade.

200. As alleged above, MasterCard and its members jointly have market power in the market for merchant acceptance of debit cards.

201. Individually and in combination, the Competitive Restraints constitute an illegal agreement to fix price of acceptance of MasterCard-branded debit cards and to prevent the operation of and interfere with the competitive process with respect to the acceptance of debit cards, in violation of Section 1 of the Sherman Act.

202. MasterCard's Honor All Cards Rules support the illegal price-fixing arrangement by eliminating the ability of merchants to gain the benefits of competition among individual issuing banks.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards from its issuing banks on an all-or-nothing basis.   Each issuing bank's cards, however, are separate products that consumers choose among based upon competition in terms among the issuing banks with respect to the individual terms and characteristics of those cards.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among issuing banks.  By unlawfully forcing merchants to accept the MasterCard-branded cards of all issuing banks, the Honor All Cards Rule has the effect of fixing the prices of acceptance paid by merchants.  But for the Honor All Cards Rule, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule does not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

203. MasterCard's Honor All Cards Rules also support the illegal price-fixing arrangement by requiring merchants to accept all MasterCard-branded debit cards regardless of

the cost of acceptance for different categories of such cards.  Under the Honor All Cards Rules, MasterCard affords merchants no choice but to accept MasterCard-branded cards on an all-or nothing basis, regardless of whether the card is a consumer card or a commercial card.  Each type of card, however, is a separate product with different costs to merchants.  The Honor All Cards Rules eliminate merchant acceptance as one of the areas of competition among different types of cards.  By unlawfully forcing merchants to accept MasterCard-branded cards of all types, the Honor All Cards Rules have the effect of fixing and raising the overall price of acceptance paid by merchants.  But for the Honor All Cards Rules' requirement that merchants accept all types of MasterCard-branded debit cards, competition among issuing banks for acceptance by merchants would lower the cost of acceptance.  The elimination of the Honor All Cards Rule would not prevent issuing banks from continuing to provide cardholders with benefits comparable to those now available.

204. MasterCard's Competitive Restraints, described above, further eliminate competition by removing the ability of merchants to gain the benefits of competition as to fees paid to particular issuing banks.  Absent these rules, merchants would have been able to (and would continue to be able to) use a variety of competitive strategies, ranging from not accepting the cards of certain issuing banks or not accepting certain card types at certain locations, to offering benefits to consumers tendering certain card types of certain issuing banks.  But for the Competitive Restraints, competition among issuing banks for acceptance, or favorable terms of acceptance, by merchants would lower the cost of acceptance for debit cards.

205. MasterCard's setting of default interchange fees for the acceptance of MasterCard-branded debit cards further prevents the cost of acceptance from being determined between Plaintiffs and the various individual issuing banks in a competitive market.  Instead,

MasterCard's supra-competitive interchange fees are set collectively by MasterCard in conjunction with or on behalf of all of its member issuing banks.  Absent the setting of "default" interchange fees for MasterCard-branded debit cards by MasterCard and the other Competitive Restraints managed by MasterCard, issuing banks would compete for acceptance by lowering the cost of acceptance of the cards for each issuing bank.

206.  The maximum debit interchange fees enacted by the Federal Reserve as a result of the Durbin Amendment have not eliminated the anticompetitive effects of MasterCard's setting of "default" interchange fees.  While the damages suffered by Plaintiffs because of the imposition of supra-competitive debit interchange fees may be reduced by regulatory maximums, the interchange fees being levied on Plaintiffs by the combination are still higher than they would be if there were active competition for merchant acceptance.  Accordingly, even after the enactment of maximum levels for debit interchange fees, Plaintiffs continue to suffer damage by being forced to pay supra-competitive interchange fees on MasterCard debit card transactions.

207.  As alleged above, Plaintiffs have suffered antitrust injury as a result of the illegal restraints on the costs charged for acceptance of debit cards by merchants, which are the result of MasterCard's Competitive Restraints.  The effect of these restraints has been to increase the cost of acceptance of debit cards paid by Plaintiffs, thereby injuring both Plaintiffs and consumers through higher costs and increased prices.

### COUNT 5: Violation of Section 2 of the Sherman Act by Visa

208.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

209.  Visa has monopoly power in the relevant market, i.e., the market for merchant acceptance of general-purpose credit cards.

210.  Visa has used its monopoly power to impose on Plaintiffs and other merchants restraints that have the purpose and effect of: (1) excluding competition from and limiting the competitive opportunities of other sellers in the market for merchant acceptance of general-purpose credit cards; and (2) maintaining Visa's monopoly power in that market. These restraints include, but are not limited to, the Competitive Restraints. The restraints imposed by Visa make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower interchange rates, lower network fees, or other attractive terms to merchants, including Plaintiffs.

211.  Alternatively, Visa has used its monopoly power to impose on Plaintiffs and other merchants restraints that have reduced competition within the Visa credit card relevant market for the sale of Visa network services to merchants. These restraints include, but are not limited to, the Competitive Restraints. The restraints imposed by Visa make it difficult or impossible for issuers within both the Visa credit card relevant market for the sale of Visa network services to merchants and the Visa Credit Card platform to increase the usage of their Visa cards by offering lower interchange Rates, lower network fees, or other attractive terms to merchants, including Plaintiffs. As a result, Visa has denied Plaintiffs and other merchant users of the Visa credit card platform the benefit of price competition for Plaintiffs' Visa transaction volume.

212.  As a direct and proximate result of Visa's exclusionary and anticompetitive conduct during the relevant time period, interchange fees and network fees rose to and remained at artificial, supracompetitive levels. During the relevant time period, Plaintiffs suffered injury to its business or property by having to pay artificially inflated, supracompetitive interchange fees for network services.

## COUNT 6: Violation of Section 2 of the Sherman Act by MasterCard

213.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully rewritten herein.

214.  MasterCard has monopoly power in the relevant market, i.e., the market for merchant acceptance of general-purpose credit cards.

215.  MasterCard has used its monopoly power to impose on Plaintiffs and other merchants restraints that have the purpose and effect of: (1) excluding competition from and limiting the competitive opportunities of other sellers in the market for merchant acceptance of general-purpose credit cards; and (2) maintaining MasterCard's monopoly power in that market. These restraints include, but are not limited to, the Competitive Restraints. The restraints imposed by MasterCard make it difficult or impossible for other card networks and providers to enter the market or increase the usage of their cards by offering lower interchange rates, lower network fees, or other attractive terms to merchants, including Plaintiffs.

216.  Alternatively, MasterCard has used its monopoly power to impose on Plaintiffs and other merchants restraints that have reduced competition within the MasterCard credit card relevant market for the sale of MasterCard network services to merchants. These restraints include, but are not limited to, the Competitive Restraints. The restraints imposed by MasterCard make it difficult or impossible for issuers within both the MasterCard credit card relevant market for the sale of MasterCard network services to merchants and the MasterCard credit card platform to increase the usage of their MasterCard cards by offering lower interchange Rates, lower network fees, or other attractive terms to merchants, including Plaintiffs. As a result, MasterCard has denied Plaintiffs and other merchant users of the MasterCard credit card platform the benefit of price competition for Plaintiffs' MasterCard transaction volume.

217.  As a direct and proximate result of MasterCard's exclusionary and anticompetitive conduct during the relevant time period, interchange fees and network fees rose to and remained at artificial, supracompetitive levels. During the relevant time period, Plaintiffs suffered injury to its business or property by having to pay artificially inflated, supracompetitive interchange fees for network services.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.  Judgment in favor of Plaintiffs and against each Defendant, in an amount to be determined at trial including, but not limited to, compensatory damages, trebled damages, and pre-judgment and post-judgment interest, as permitted by law;

B.  An award of the cost of the suit, including a reasonable attorney's fee; and

C.  Such other and further relief as the Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated: February 24, 2020

Respectfully submitted,

By: s/ Kevin B. Love
Kevin B. Love
Fla. Bar No. 993948
Michael E. Criden
Florida Bar No. 714356
**CRIDEN & LOVE, P.A.**
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
klove@cridenlove.com
mcriden@cridenlove.com

*Counsel for Plaintiffs Boyd Gaming
Corporation, Briad Restaurant Group,
L.L.C., Creative Hairdressers, Inc., MGM
Resorts International, Ratner Companies,
L.C., Seminole Hard Rock Entertainment,
Inc., Seminole Tribe of Florida, and TGI
Friday's Inc.*